IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**FILED**

Jun 21, 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

KYLE FRANK,

                Petitioner,

     vs.

A. W. LIZARRAGA, Warden, Mule Creek
State Prison,

             Respondent.

No. 2:14-cv-01011-JKS

MEMORANDUM DECISION

Kyle Douglas Frank, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Frank is in the custody of the California Department of Corrections and incarcerated at Mule Creek State Prison.  Respondent has answered, and Frank has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On February 22, 2011, Frank was charged with 8 counts of attempted murder (counts 1, 3, 5, 6, 7, 9, 11, and 12) and 4 counts of discharge of a firearm at an occupied motor vehicle (counts 2, 4, 8, and 10).  The information further alleged as to counts 1, 3, 5, 6, 7, 8, 11, and 12 that Frank personally used and discharged a firearm in the commission of these offenses.  In association with all counts, the information alleged that Frank's commission of the offenses constituted a hate crime.  Frank pled not guilty to all counts and denied the enhancements.  On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Frank:

> [Frank] was fired from his job as a truck driver in the summer of 2009.  The job
> loss resulted in [Frank] moving in with his father and stepmother.  His girlfriend broke up
> with him around the same time.  In August 2009, [Frank] was hired by Thunder Valley

Casino as a porter, doing janitorial work, but he "wasn't happy about that job." These events caused [Frank] to begin drinking on a daily basis, "at least a six-pack at the minimum." [Frank] also began using cocaine "[a]t least once a week." The combined effect of alcohol and cocaine made [Frank] "nervous" and "paranoid." Shortly before the first shooting incident, [Frank] began carrying a loaded .25 caliber semi-automatic handgun in the center console of his Nissan Altima.

### The First Shooting Incident (Counts 1 and 2)

On August 22, 2009, at around 11:00 p.m., [Frank] was driving eastbound on the Capitol City Freeway. He was under the influence of both alcohol and cocaine and was driving below the speed limit in the fast lane. Before the Watt Avenue exit, [Frank's] Altima was approached quickly from behind by a Nissan 350Z driven by Paul Adcock. After briefly tailgating the Altima, Adcock changed lanes to pass [Frank]. Adcock looked into the Altima as he passed and saw [Frank] "screaming" and giving him the "single finger salute." Adcock, who is African–American, could not hear what [Frank] was yelling, but he "could make out the word 'nigger' " by reading [Frank's] lips. Adcock returned to the fast lane after passing the Altima. [Frank] then changed lanes, caught up to the 350Z a few seconds later, and continued his angry tirade alongside Adcock's car. As Adcock described: "The [word] nigger came up quite a few times again and he was angry. He just seemed very tense about something."

At this point, Adcock realized [Frank's] Altima would not be able to keep up with his 350Z, so he pressed down on the gas pedal. As Adcock created some distance between himself and the unwanted confrontation, [Frank] grabbed the handgun he kept in his center console and fired "four or five shots" at Adcock's car. One bullet shattered Adcock's passenger side mirror and others hit the passenger door, passenger side windshield frame, and hatchback roof. Adcock called 911 on his cell phone as he drove home. Officers with the California Highway Patrol (CHP) met Adcock at his house and took his statement.

### The Second Shooting Incident (Counts 3 through 6)

On August 31, 2009, at around 8:00 p.m., [Frank] was driving on Florin Road approaching Interstate Highway 5. He was again under the influence of both alcohol and cocaine. As [Frank] got onto the freeway onramp, he began tailgating a Dodge Caravan driven by Tina Arteaga. Arteaga's 14–year–old daughter, Isabella, and four-year-old son, Christopher, were also in the minivan. Christopher was in the front passenger seat. Isabella was seated directly behind Arteaga. Noticing [Frank] following at a distance of "[m]aybe a foot," Arteaga "veered over to the right a little bit so [Frank] could see that there was a big rig in front of [her] and there was nowhere [she] could go." [Frank] began "going to the left, going to the right, going to the left, going to the right, getting closer, scooting back, getting closer." When Arteaga reached the freeway, she stayed to the right while [Frank] passed her on the left and yelled something at her. Arteaga responded by yelling: "Watch how you are fucking driving. My kids are in the car with me." [Frank] then pulled out the handgun used in the previous shooting, reached over the back seat with the gun, and fired four rounds at Arteaga's minivan through the Altima's

2

open right rear window.  Bullets hit the driver's side headlight, wheel well, and door frame.  Arteaga called 911 and met with CHP officers at Isabella's father's house.

### The Third Shooting Incident (Counts 7 and 8 )

On September 6, 2009, at around 10:00 p.m., [Frank] was driving northbound on Interstate Highway 5 near Sutterville Road.  Again, he was under the influence of both alcohol and cocaine. Jaime Hernandez was traveling the same direction in a Nissan Maxima.  Hernandez noticed [Frank] "swerving in and out of traffic cutting people off left and right."  When [Frank] cut in front of Hernandez's Maxima, Hernandez flashed his high beams, prompting [Frank] to hit his brakes three times in rapid succession. Hernandez also hit the brakes to avoid colliding with [Frank's] Altima.  He then changed lanes to the right and "accelerate[d] past [Frank] to get away."  [Frank] followed in pursuit, catching up to Hernandez a short distance down the freeway.  At this point, [Frank] changed lanes to the right, pulled up beside the Maxima, and fired four rounds into the side of Hernandez's car.  Three bullets lodged in the front and rear passenger doors.  One bullet went through the front passenger door and lodged in the back of the front passenger's seat.  Hernandez accelerated away from the gunfire and watched as [Frank] merged onto the Capitol City Freeway.  Hernandez then exited the freeway at Richards Boulevard and pulled into a McDonald's parking lot to assess the damage. Several days later, Hernandez gave a statement to police, providing a description of [Frank's] car along with a partial license plate number ("5NZK" or "5MZK"); the plate number of [Frank's] Altima was 3NZK296.

### Fourth Shooting Incident (Counts 9 through 12 )

On September 9, 2009, at around 8:00 p.m., [Frank] was driving eastbound on Interstate Highway 80 near Antelope Road.  Yet again, [Frank] was under the influence of both alcohol and cocaine.  Monica Esparza was traveling the same direction in a Dodge Caravan.  Esparza's niece, Osiris, and son, Antonio, were also in the minivan.  Osiris was in the front passenger seat.  Antonio was seated directly behind Osiris. [Frank's] Altima approached Esparza's minivan from behind at a high rate of speed, causing Esparza to change lanes to the right to allow him to pass her on the left.  Instead, [Frank] followed Esparza to the right, cut across two lanes of traffic, and pulled up next to the minivan's passenger side.  [Frank] pulled out the same handgun used in the previous shootings and yelled, "what nigga," "fuck you," and "motherfucker" out the window.  With [Frank's] left hand on the steering wheel and the gun resting on his left bicep, [Frank] fired at least five rounds into the side of the minivan.  Three bullets hit the front passenger door.  One of these bullets penetrated the door and hit Osiris in the leg.  One bullet hit the minivan's rear sliding door.  A fifth bullet went through the right rear passenger door window. Esparza took the next exit, drove home, and called the police.

*[Frank's] Arrest . . .*

On September 13, 2009, [Frank] was stopped by a CHP officer while driving under the influence of alcohol and cocaine. Based on [Frank's] "red, watery eyes" and "dilated pupils," the officer believed [Frank] was under the influence of either alcohol or marijuana. [Frank] was taken into custody after failing a field sobriety test. On the way to the CHP office, [Frank] asked why he was under arrest when his breath had not been tested. When the officer explained such a test would not detect the presence of marijuana, [Frank] began an "aggressive, agitated and extremely derogatory" rant, exclaiming that "only niggers smoke that" and asking the officer whether he "look[ed] like a stupid nigger." He used "the word 'nigger' probably approximately 12 times all the way up to the [CHP] office."

Law enforcement officers found four expended shell casings inside [Frank's] Altima. [Frank's] handgun was found in his bedroom. Bullets taken from Arteaga's minivan and Hernandez's Maxima were identified as having been fired from [Frank's] gun. Bullets taken from the other vehicles were consistent with [Frank's] gun, but could not be conclusively matched.

*People v. Frank*, No. C068050, 2013 WL 5964773, at *2-3 (Cal. Ct. App. Nov. 8, 2013).

On February 24, 2011, Frank proceeded to a trial by jury. The jury began deliberations on March 9, 2011. The following day, the trial court discharged Juror No. 9 from jury service for intentionally concealing material information during voir dire. A replacement juror was selected, and the jury commenced deliberations. On March 14, 2011, the jury found Frank guilty of all counts. The jury found true the allegations that Frank personally discharged a firearm and also found true the allegations that Frank personally used a firearm during the commission of the offenses. As to all counts, however, the jury found not true the allegation that the offenses constituted hate crimes. Frank subsequently moved for a new trial on the basis of the dismissal of Juror No. 9, which was denied. The trial court then sentenced Frank to an aggregate imprisonment term of 90 years and ordered him to pay $270.17 for a main jail booking fee.

Through counsel, Frank appealed his conviction, arguing that the trial court erred by: 1) removing Juror No. 9 from deliberations; 2) having a deputy sheriff stand near Frank when he testified; and 3) imposing the booking fee. The Court of Appeal unanimously affirmed the

judgment against Frank in its entity in an unpublished, reasoned opinion issued on November 8, 2013.  Frank petitioned the California Supreme Court for review, which was denied without comment on January 21, 2014.

Frank timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on April 22, 2014.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Frank raises his claim that the trial court prejudicially erred and violated his constitutional rights to due process and to a unanimous jury verdict by dismissing Juror No. 9 during deliberations.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

Frank contends that the trial court violated his rights to due process and to a unanimous jury verdict when it dismissed Juror No. 9 during deliberations.  In rejecting this claim on direct appeal, the Court of Appeal described the following underlying facts:

> Juror No. 9 was asked on his juror questionnaire whether "[he], a close friend or relative [had] ever been a victim of crime."  He answered, "No."  During voir dire, after some of the prospective jurors mentioned their homes being broken into, Juror No. 9 stated: "I need to add something to the voir dire," and explained: "Because my parents were victims of burglary a long, long time ago, I was witness to that."  In response to the trial court's questions, Juror No. 9 revealed the burglary occurred in Detroit, Michigan, and no one was arrested for the crime.  The trial court then asked: "Is there anything about having witnessed that incident and not having anybody arrested or prosecuted that would cause you a concern yourself on your own ability to stay objective in this case?"  Juror No. 9 answered: "No."  The trial court then asked: "Can you think of anything else in your background or training the attorneys might find of interest?"  Juror No. 9 answered: "No."
>
> Prior to Juror No. 9 being questioned by the trial court, one of the prospective jurors (R.) revealed an incident that occurred "10 years ago," in which his house was "burglarized" and his mother was "attacked . . . with an ice pick in [the] garage" during the burglary.  Also prior to Juror No. 9 being questioned, another prospective juror (C.) revealed an incident that occurred "20 years ago," in which her brother was driving her father's car and someone fired a shotgun at the vehicle.  After Juror No. 9 was questioned, another prospective juror (V.) revealed an incident that occurred "30 years ago," in which she and a friend were shot at while driving.  V. was removed by the trial court after she stated she "would not be in the frame of mind to be fair to anyone" because the school she worked for would not be able to cover for her absence and she would be "worried about [her] kids."  During the first round of peremptory challenges, the prosecution used a peremptory challenge to remove R. from the panel.  Immediately thereafter, defense counsel used a peremptory challenge to remove C.
>
> Voir dire continued.  Other prospective jurors revealed that their homes had been broken into.  One prospective juror, who was seated on the jury as Juror No. 5, revealed he witnessed a "breaking and entering" that occurred "30, 35 years ago."  Juror No. 5 also revealed he was the victim of an armed robbery that occurred "35, 40 years ago."  In connection with the "breaking and entering" incident, the trial court asked whether there were "any weapons involved." Juror No. 5 answered: "No."
>
> Despite the fact Juror No. 9 was aware he could amend his previous response to voir dire questions, having done so after hearing other prospective jurors mentioning their homes being broken into, and despite the fact he witnessed one prospective juror removed after revealing that his mother was attacked during a burglary and two other prospective jurors removed after recounting shooting incidents, Juror No. 9 did not

amend his previous response to reveal what he later shared with his fellow jurors during deliberations, i.e., that he was not simply a witness to his parents having their house burglarized. Instead, he was home when the burglary occurred and was shot in the foot by the burglar. Thus, Juror No. 9 omitted the fact he was the victim of an assault with a firearm during the burglary.

During deliberations, the trial court received a note from the jury stating that a majority of the jury wanted Juror No. 9 "removed for obstructing the process and bias." Upon receiving the note, the foreperson was brought into the courtroom and questioned. She explained that six or seven jurors had complained Juror No. 9 did not "seem mentally stable," he was "changing his mind every 30 seconds," he had accused her of having "ulterior motives" and "trying to sway the [jury's] decision," and he was "deriding [her] personal experience" and that of other jurors.

Juror No. 9 was then brought in for questioning. The trial court explained: "[T]here have been some concerns raised by other jurors that maybe you're not allowing the process to move forward in a way that somehow manifests some bias and a concern about whether or not you're really treating the other jurors courteously. [¶] Do you have—as you sit here talking about it, do you have in mind things that you've done in the deliberation room that would be viewed by the other jurors as not being courteous?" Juror No. 9 responded: "No, I wouldn't characterize it as that. May be taken as that." He then mentioned he had "some problems" with certain comments made by the foreperson at the start of their deliberations he perceived as the foreperson "immediately trying to skew [the deliberations] in her favor." The trial court explained it was "not in any way in the position to dictate how the jury goes and does its duty" and asked Juror No. 9 whether he had said anything in the deliberation room that "could be perceived by other jurors as indicating a bias about the matter." Juror No. 9 responded: "Uh, first of all, I'm the lone hung juror in the verdict in several of the counts, so several of them have accused me of being biased. But you're asking me have I said something that they perceived as bias—" The trial court clarified: "Well, you know, something that as you look at it now would say, yes, that was an indication that I wasn't able to keep deliberating, wasn't—" Juror No. 9 answered: "I haven't told them that I was in any way not wanting to deliberate anymore. I did tell them based on my experience—and we all shared some of our experiences in trying to resolve the decisions from this case, and it was [in] the instructions to use your experiences." The trial court responded: "Sure." Juror No. 9 continued: "I had a particular instance that made it clear to me that there was a reasonable doubt on something. And I think that that was perhaps perceived as bias." The trial court then stated it wanted to avoid "getting into specifics," again stated it was not in the "position in any way to get in and resolve things for a jury," and asked: "Is there anything that in your mind precludes you from continuing to deliberate with the other jurors, continuing to treat them courteously and going on with the process?" Juror No. 9 responded: "There's nothing. It's a two-way street. I told you I'm the one that's under the gun. I've been called an idiot already. Okay. I've never called anybody an idiot. I never told them I didn't want to go on or answer their questions."

The trial court called in the entire jury and reread a portion of CALCRIM No. 3550: "It is your duty to talk with one another and to deliberate in the jury room. You

must try to agree on a verdict, if you can.  Each of you must decide the case for yourself but only after having discussed the evidence with the other jurors.  [¶]  Do not hesitate to change your mind if you become convinced that you are wrong, but do not change your mind just because other jurors disagree with you.  Keep an open mind and openly exchange your thoughts and ideas.  [¶]  Please treat one another courteously.  Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other."  The trial court then ordered the jury to return to their deliberations.

After the jury stepped into the hallway, Juror No. 10 returned to the courtroom and asked the trial court: "Can I say something to you?"  The trial court had Juror No. 10 take a seat in the jury box and heard her complaints about Juror No. 9: "Well, this guy I just don't think he's mentally stable.  I mean, he's not rational.  He's in everybody—everybody thinks that.  All of us think that.  And we're just never going to come to a conclusion.  I mean, he's just not in his right mind.  [¶]  And when he was sitting here when you guys were picking jurors, he was writing all kinds of bizarre stuff and saying—you know, when they picked him and he was sworn in, he was, like, I made it.  And he's just—he's not in his right mind.  [¶]  And I personally can't sit there and just—I can't argue with—I mean, I can't even—he's not rational.  I can't do it.  And I can't—I want to do the right thing and—I don't know how long this is going to go.  I've got to pay my bills.  I've got to do things, and this guy is enjoying this.  He's enjoying antagonizing me.  [¶]  I really believe that he has a mental problem and he's not using his common sense.  And everybody—if you would bring everybody in, and I would beg you to do that, they would all say the same thing.  [¶] . . . [¶]  And he didn't tell you that he brought up an incident—when you asked us if we had certain issues from the past, he told us that he got—he was—some guy attempted to shoot him in the foot when he was younger.  [¶]  He had an incident he didn't tell you about, any of you guys about.  He didn't share that with you, and I think that he has a bias.  I mean, I think that's important.  And we all—when you asked us questions, we gave you our correct answers to the questions and we told you what happened in our past.  He didn't tell you that."  Juror No. 10 also stated Juror No. 9 was playing Sudoku "during the testimony" in the trial.

The trial court then brought Juror No. 9 back in for questioning concerning Juror No. 10's allegations of his "not sharing something that he would have been obligated to share [during voir dire] and not paying attention during the testimony, playing games."  With respect to his failure to disclose the shooting incident, Juror No. 9 explained he was shot in the foot during the burglary incident he did disclose in voir dire.  He elaborated: "It was a home invasion robbery.  Well, I don't know if I—somebody broke into my house.  I was taking a nap.  Guy woke me up.  At the same time he heard my parents coming in the door, so he gathered us all up and he had a gun and he shot down at the ground to scare me and then that bullet didn't go off at all.  And I challenged him and he shot at me again at my foot."  The trial court asked: "And when he shot at you, it actually hit your foot?"  Juror No. 9 responded: "Yeah."  The trial court asked: "So you had a gunshot wound in the foot?"  Juror No. 9 answered: "Yes."  Juror No. 9 also explained that while the perpetrator was "wearing a mask," he believed the man "looked like an African American," and added: "I lived in inner city Detroit."  With respect to playing

9

Sudoku, Juror No. 9 denied playing the game during trial, but admitted he "[m]ay have" played during jury selection.

Juror No. 11 was then questioned and confirmed he observed Juror No. 9 playing Sudoku during the first or second day of trial, but did not know whether witnesses were testifying at the time.

After Juror No. 11 exited the courtroom, the trial court stated that what Juror No. 9 revealed during voir dire (i.e., that his "parents were victims of burglary a long, long time ago" and he "was witness to that") is "quite different than being the victim of a home invasion where he's actually shot." The trial court also found Juror No. 11's statement regarding the Sudoku incident to be credible.

The prosecutor asked that Juror No. 9 be removed from the jury and argued: "When we questioned him about the home invasion that . . . I am positive he did not mention during voir dire. He at first seemed nervous and then he seemed more emotional when he began to discuss the portions of the incident more specifically, being woken up, being assaulted with the firearm. [¶] Also, when the Court asked him about the race of the perpetrator, he hesitated and then said that the—the person was wearing a mask, but he could tell that that person was African American and then made a comment about living in inner city Detroit. [¶] . . . [M]y concern would be that [Juror No. 9] harbors some ill [will] towards African Americans because of the fact that he was the victim of a home invasion robbery perpetrated by what he believed to be an African American male. [¶] And because of that, and the representations about him playing Sudoku when [Adcock], I guess, would have been on the stand when we first began, according to [Juror No. 11]. Based upon that and the other issues, not paying attention, I'd ask he be excused." Defense counsel objected to Juror No. 9's removal and pointed out the importance of the trial court's decision, "especially with [Juror No. 9's] comment being an unsolicited comment—he shouldn't have made it maybe—that he's the lone holdout on a number of counts."

The trial court responded: "The Court absolutely appreciates that, but I would say for the record's purposes that I'm specifically not making any determinations based on that part of his representation because from my standpoint, that's not an issue that I wanted to know, need to know. [¶] I have to make the determination absolutely putting that aside and just looking and saying, you know, what do I have in front of me? And what I have is somebody who now it looks like there's pretty good evidence that he wasn't candid with the Court over all the things that he's witnessed. [¶] You know, to say, you know, he witnessed that burglary and it really wasn't a burglary, it was a home invasion, at least he would have told us he was shot or that there was a gun being used. [¶] The Court thinks that I asked at some point the generic question of whether, you know, people had been shot at. I may not have asked every witness—or every potential juror, but for [Juror No. 9] to miss the import of, you know, hey, this is something that counsel and the Court would have wanted to have them told and to say, hey, you can respond that there's no concern over it and my follow up would have been looking at his questionnaire to start with, which had the specific representation that he was not a personal witness to something, you know, would have downplayed my inquiry, just like it happened and say, no, this is just something that's come up because somebody else

mentioned a burglary.  [¶]  That's not what this person now has said they had happen and that causes the Court great concern if then the scenario is the person writes so that another juror can see it, you know, I made it.  [¶]  And the inference is, yes, there is potential bias that's inferred from that, just the failure to disclose and writing after that failure to disclose 'I made it' and then the actions being that he's playing Sudoku at the beginning of the trial when we had the African American victim.  [¶]  So from the Court's standpoint, the Court will, even over the defense objection here, excuse [Juror No. 9]."

*Frank*, 2013 WL 5964773, at *4-7.

Frank argues that the trial court's removal of Juror No. 9, "the lone hung juror" on several counts, "infringed on [his] rights to a unanimous jury decision and to due process and a fair trial."  Frank contends that the trial court's dismissal for cause was error "because there was no demonstra[]ble reality of [Juror No. 9's] inability to perform."

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. CONST. AMEND. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Green v. White*, 232 F.3d 671, 676 (9th Cir. 2000).  Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see also United States v. Plache*, 913 F.2d 1375, 1377-78 (9th Cir. 1990).  An impartial jury consists of jurors who will conscientiously apply the law and find the facts.  *Lockhart v. McCree*, 476 U.S. 162, 178 (1986).

In accordance with these protections, the Sixth Amendment does not prohibit the mid-deliberation dismissal of biased jurors or jurors who are unable to serve or engage in misconduct.  *See, e.g.*, *Williams v. Johnson*, ___ F.3d ___, 2016 WL 3034705, at *3 (9th Cir. May 27, 2016); *Perez v. Marshall*, 119 F.3d 1422, 1427 (9th Cir. 1997) (collecting cases from other circuit courts); *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985).  However, a court may not discharge a juror on account of his views of the merits of the case.  *See United States v.*

*Symington*,[1] 195 F.3d 1080, 1085 (9th Cir. 1999) (quoting *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir. 1997) ("To remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict.")).  This is because an essential feature of the jury trial right is that only the group of jurors determine guilt or innocence. *Williams v. Florida*, 399 U.S. 78, 100(1970).  Selective dismissal of jurors based on their views of the merits of the case would obstruct the jury's independence, eliminate the necessary secrecy of deliberations, and vitiate the essential role of the jury to act as a safeguard against the power of the state and the court.  *Symington*, 195 F.3d at 1085-86.

California Penal Code § 1089 provides for the substitution of jurors as follows:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

The Ninth Circuit has held that § 1089 is facially valid and retains the "essential feature" of the jury required by the Sixth and Fourteenth Amendments.  *Miller*, 757 F.2d at 995.  Thus, in considering a petition for habeas relief concerning the removal of a "hold-out" juror, this Court must assess the state court's application of § 1089 by determining: 1) whether good cause

---

[1]      In *Symington*, the Ninth Circuit held that, "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror."  *Symington*, 195 F.3d at 1087 (emphasis in original).  But as the U.S. Supreme Court has recognized, *Symington* "do[es] not bind" the California courts "when [they] decide[] a federal constitutional question".  *Johnson v. Williams*, 133 S. Ct. 1088, 1098 (2013); *see also Williams*, 2016 WL 3034705, at *3 (quoting *Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir. 2004) (holding that a habeas petitioner's reliance on *Symington* was "misplaced" because "*Symington* is not a Supreme Court case" and because *Symington*'s analysis was based on the Federal Rules of Criminal Procedure rather than the Sixth Amendment")).  The *Symington* rule therefore does not apply here.

existed for the trial court to excuse the juror; and 2) whether Sixth Amendment rights were violated by excusing a juror when it was known that the juror was the lone juror holding out for an acquittal.  *Perez*, 119 F.3d at 1426.

On habeas review, a trial court's findings regarding good cause and juror fitness are entitled to special deference.  *Id.*; *cf. Patton v. Yount*, 467 U.S. 1025, 1036–38 & n.12 (1984) (whether juror can render impartial verdict is question of historical fact entitled to special deference).  The trial court is in a superior position to observe the juror's physical appearance and demeanor and thereby to determine whether the juror has an opinion or disability that disqualifies the juror or impacts his or her ability to continue deliberating.  *Perez*, 119 F.3d at 1427.  Whether a trial court violates a defendant's Sixth Amendment right to a jury trial by excusing a juror for good cause and replacing that juror with an alternate is a question of law. *Id.* at 1426.

Applying these legal principles to Frank's claim, the state court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  While the record indicates that the court was aware that Juror No. 9 was the lone holdout, that fact is not dispositive.  *See id.* at 1427 (dismissal of holdout juror permissible because juror's emotional instability that made her unable continue deliberating provided good cause for her dismissal).  As the Ninth Circuit explained in *Perez*, "[t]he fact that the trial judge knew that [the juror] was the sole juror holding out for an acquittal when he dismissed her does not invalidate his decision to excuse her from jury service."  *Id.* at 1426.  The *Perez* Court reasoned that the trial judge was "forced to act, not because of [the juror's] status as a holdout

juror, but because of [the juror's] emotional inability to continue performing the essential

function of a juror-deliberation." *Id.*

      Similar to *Perez*, as the Court of Appeal found in rejecting Frank's claim on direct

appeal:

>       Juror No. 9's concealment of the fact that he was the victim of an assault with a
> deadly weapon constitutes misconduct and good cause for his discharge from the jury.
> Juror No. 9 was directly asked on his juror questionnaire whether "[he], a close friend or
> relative [had] ever been a victim of crime." . . . [T]his question was "relevant to [the] voir
> dire examination, unambiguous in character, and pertained to matters about which [Juror
> No. 9] had substantial knowledge of the information sought to be elicited." As
> mentioned, Juror No. 9 initially answered, "No." He amended his response during voir
> dire to reveal his "parents were victims of burglary a long, long time ago," and he "was
> witness to that." However, during deliberations, he revealed to his fellow jurors he was
> not simply a witness to his parents having their house burglarized. He was home when
> the burglary occurred and was shot in the foot by the perpetrator. Despite the fact Juror
> No. 9 was aware he could amend his previous response to reveal these facts, and despite
> the fact he witnessed one prospective juror removed after revealing his mother was
> attacked during a burglary and two other prospective jurors removed after recounting
> shooting incidents, Juror No. 9 did not amend his previous response to reveal what he
> later shared with his fellow jurors, i.e., he was the victim of an assault with a firearm
> during the burglary. Moreover, when Juror No. 9 was selected as one of the jurors, he
> stated: "I made it." From these facts, the trial court was justified in concluding Juror No.
> 9's concealment of the shooting was intentional. Such intentional concealment of
> material information may constitute implied bias justifying removal. The trial court's
> removal of Juror No. 9 from the jury violated neither section 1089 nor [Frank's]
> constitutional rights.

*Frank*, 2013 WL 5964773, at *8 (citations omitted).

      The Ninth Circuit's decision in *Sanders v. Lamarque*, 357 F.3d 943 (9th Cir. 2004), does

not compel a contrary conclusion. In *Sanders*, the Ninth Circuit distinguished *Perez* and granted

habeas relief where the trial court removed the lone holdout juror, concluding that there was

strong evidence that the removal was motivated by the trial court's desire to have a unanimous

verdict. 357 F.3d at 950. However, as the Court of Appeal concluded in rejecting Frank's claim

on direct appeal, *Frank*, 2013 WL 5964773, at *8, *Sanders* is factually distinguishable from the

14

case here.  In *Sanders*, unlike in Frank's case, the trial court dismissed who it knew to be the lone holdout juror when there was no evidence that the juror concealed information during voir dire, nor any evidence that the juror harbored bias or impermissible prejudice during the deliberation process.  357 F.3d at 950.  Because there was evidence in this case that Juror No. 9 made material misrepresentations during voir dire, *Sanders* does not apply.

Here, the state court's conclusion is reasonable and fully supported by the record.  Its determination that Juror No. 9 was properly discharged was not contrary to or an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts.  Frank therefore fails to demonstrate that his constitutional rights were violated by the discharge, and he is not entitled to habeas relief.

## V. CONCLUSION AND ORDER

Frank is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 21, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

16